**CARDING SPECIALISTS (CANADA) LIMITED, Plaintiff,**

v.

**LUMMUS COTTON GIN CO., Aldrich Machine Works, and A. P. Aldrich, Jr., Defendants.**

**Civ. A. No. 974.**

United States District Court
M. D. Georgia,
Columbus Division.

Aug. 27, 1964.

James E. Nolan, Norris & Bateman, Washington, D. C., Sol E. Abrams, Greenville, S. C., and Kenneth M. Henson, Kelly, Champion & Henson, Columbus, Ga., for plaintiff.

Hugh P. Carter, Jennings, Carter & Thompson, Birmingham, Ala., Lee H. Henkel, Jr., Swift, Pease, Davidson & Chapman, Columbus, Ga., for defendants.

ELLIOTT, District Judge.

Plaintiff, Carding Specialists (Canada) Limited, a Canadian corporation, is the owner by assignment of United States Letters Patent No. 3,003,195 issued on October 10, 1961 upon an application filed in the United States Patent Office on October 31, 1958 by Andre Varga, assignor to the Plaintiff. The patent in suit relates to a process and apparatus for improving the quality of yarn made of cotton and Plaintiff is engaged in the manufacture and sale of a machine under the terms of the patent which it markets under the trade name "CROSROL."

Defendants, Lummus Cotton Gin Company, a Georgia corporation, Aldrich Machine Works, a South Carolina corporation, and A. P. Aldrich, Jr., individually, a resident of Atlanta, Georgia, manufacture and market a machine similar in some respects to Plaintiff's machine under the trade name "TRASHMASHER."

The Plaintiff brings this suit under the patent laws of the United States claiming infringement of its patent. The Defendants pleaded non-infringement and invalidity of the subject patent for various statutory reasons within the meaning of 35 U.S.C. § 103, including anticipation, prior public use and sale, prior publication, lack of utility and lack of invention. In support of this defense the Defendants more than thirty days prior to the trial of the case notified Plaintiff of certain prior art and prior publications and claimed instances of prior public use, some of which were relied upon during the trial.

Prior to the trial of the case the Court read the deposition of Andre Varga, which had been taken by the Defendants for the purpose of discovery and evidence in the case, and also read the deposition of Clarence F. Williams, Jr., also taken by the Defendants, the Williams deposition having to do with a machine marketed under the name of "ROL-A-SLIVUP," it being admitted by the Plaintiff that this machine was in prior public use in Parkdale Mills, Gastonia, North Carolina, more than one year prior to October 31, 1958, the filing date of the patent in suit. Also, in preparation for the trial of this case, the Court in the company of counsel for all parties visited a commercial spinning mill in Columbus, Georgia and there spent some time studying and observing the operation of the machine and process of the Plaintiff (the "CROSROL") and the accused machine and process (the "TRASHMASHER"), the machines being in operation side by side. After a trial of the issues and the submission of

briefs by the respective parties, the case is now before the Court for determination.

A brief historical background may contribute to a better understanding of the patent in suit and the issues involved. Mechanical cotton harvesters came into noticeable use after the end of World War II. As the use of these harvesters became more widespread new problems which arose led the cotton ginning industry to adopt the use of "saw-type lint cleaners." A few statistics will best illustrate the change. In 1948 there were only 27 cotton gins in the United States equipped with saw-type lint cleaners. In 1949 there were 109 gins using them out of a total of 8,097 gins in the country. In 1950 there were 376 out of 7,570. In 1951 there were 898 out of 7,650. By 1956 there were 3,497 out of 6,662. In 1959 there were 4,616 out of 5,629, and in 1961, the year in which the patent in suit was issued, 5,046 gins were using the saw-type lint cleaners out of a total of 5,223. After the use of saw-type lint cleaners became general in the ginning industry the cotton textile industry found it necessary to do something to eliminate particles of trash left in the raw cotton after the ginning process. As might be expected, persons interested in the manufacture of textile machinery were alert to this developing need and they naturally looked to industry experience in related fields for ideas which might be incorporated in new products. For many years the woolen industry had dealt with the problem of foreign matter in wool and the woolen fiber had been passed through crushing rolls under sufficient pressure to fragmentize the trash, leading to the elimination of much of it in subsequent processing. Obviously, if this was effective with wool, there was reason to anticipate that the technique might be made effective with cotton. This idea was explored and thus it was that the use of crushing rollers on the cotton web became basic in the "CROSROL," later manufactured by Varga and his assignee, and in the "TRASHMASHER," still later manufactured by Lummus.

By 1961 Varga had his apparatus on the market and Harold C. Lummus, President of Lummus Cotton Gin Company, had conversation and correspondence with Varga about an arrangement whereby Lummus might manufacture Varga's "CROSROL" apparatus. The patent in suit had not been issued at that time. Lummus knew that Varga had a patent on the misalignment of the axes of two crushing rollers to crush impurities in a cotton web. He did not know that Varga had an application for patent pending on any other subject matter relating to the "CROSROL" machine. Lummus at that time was under the impression that the crossing of the rollers (the misalignment of the axes) was essential to make the machine work and it was with this in mind that he had asked Varga to allow him to manufacture the rollers. Varga never expressed any interest in such an arrangement and Lummus began some experimentation in making crush rollers that would not require the crossing of the rolls in the Varga fashion and which would produce a uniform line of contact on the web from end to end as it came off of the doffer. He engaged specialists to do research on the matter and developed rollers of a particular shape which gave uniform end to end contact under pressure with the axes of the rollers parallel and in such adjustment as to eliminate the necessity for crossing the rollers. He then began making and marketing the machine which he called the "TRASHMASHER." Later he learned of the issuance of the Varga patent which is here in suit when the patent was published in the Patent Office Gazette. He ordered a copy of the patent and sought and obtained the advice of counsel as to whether the Varga patent would bar the manufacture of the "TRASHMASHER." Based upon the advice obtained he proceeded with the manufacture of the "TRASHMASHER." Through such background we have now arrived at this point of decision.

## THE PATENT IN SUIT

As already indicated, the patent in suit relates to a process and apparatus for

removing impurities in a cotton web which has the effect of improving the quality of the yarn eventually produced. The patent asserts five claims. No contention is made with respect to claims 4 and 5. Only claims, 1, 2 and 3 are involved in this litigation.

Claim 1 is a process claim and this claim asserts that if a moving web of cotton, as it comes from a cotton card, is passed through a pair of crushing rollers adapted to crush small impurities in the web, and on leaving the crushing rollers is then subjected to a "longitudinal drafting action sufficient to cause relative longitudinal fiber movement in the web," then as a result of these steps the small particles of trash in the fibers of the web will fall out during subsequent processing. Such subsequent processing would be drafting, spinning and weaving. Although not recited in claim 1 the patent also teaches that the "drafting" referred to can best be brought about in the web of cotton fibers as the web leaves the doffer of the carding machine and before it is condensed in width to form a sliver, it being customary to eventually form the web into a sliver for transfer to subsequent operations. To carry out this concept the patent proposes placing the crushing rollers in position to receive the moving web as it comes off of the doffer between the crushing rollers in full width and then to run the calender rolls of the carding machine at a speed sufficiently greater than the surface speed of the crushing rollers to subject the web on leaving the crushing rollers to "longitudinal drafting action," which longitudinal drafting action is in itself sufficient to "cause relative longitudinal fiber movement" in the web, the theory being that this "longitudinal fiber movement" is an essential part of the process.

Claims 2 and 3 of the patent in suit are apparatus claims and these claims cover generally a combination of a pair of crushing rollers which are located between the doffer and the calender rollers of the cotton carding machine and which are adapted to receive the carded web in substantially full width from the doffer.

These two claims when considered in combination also set forth a means to rotate the crushing rollers at a speed sufficient to take up slack in the web which is said to exist between the doffer and crushing rollers. Also taken in combination, these two claims further include mechanical drive arrangements to rotate the calender rollers at a sufficiently greater surface speed than the crushing rollers so as to "cause relative longitudinal fiber movement" in the web as it passes from the crushing rollers to the calender rollers.

It is nowhere indicated within the patent itself nor within the contents of the file wrapper of the application resulting in the patent in suit how much faster the calender rolls must be run in comparison to the speed of the crush rolls to bring about the desired result, nor is there any mention of what diameter the crushing rolls must be or how much pressure must be applied to the crush rolls to bring about the required degree of crushing of trash to cause it to fall out during subsequent processes.

## THE ACCUSED PROCESS AND APPARATUS

None of the Defendants carry out the process recited in claim 1 of the patent, but they are engaged either in the manufacture, installation or sale of the "TRASHMASHER" units to textile mills which already have carding machines on which the units are placed.

The accused apparatus embodies a pair of smooth surface crushing rolls which are pressed together with sufficient force to crush small impurities in the carded cotton web, these crushing rolls being located between the doffer and the calender rolls of the carding machine. When these crushing rollers are installed by the Defendants on a cotton card the then existing speed of the calender rolls of the carding machine is not changed, the surface speed of such calender rolls being usually about 15% faster than the surface speed of the doffer.

The crushing rolls of the "TRASH-MASHER" perform the same function as

the crushing rolls of the "CROSROL." They crush small impurities in the cotton web in anticipation that the fragments will fall out during the course of subsequent processing.

## PLAINTIFF'S CONCEPT OF THE PATENT IN SUIT

The Plaintiff's concept of its patent emphasizes the claimed necessity for the joint presence and action of two things, first, the crushing of the web by the crushing rollers, and second, the drafting of the web in such manner as to cause "relative longitudinal fiber movement" in the moving web as it passes between the crushing rollers and the calender rollers. Not only the patentee, Andre Varga, but other witnesses for the Plaintiff and Plaintiff's counsel in argument during the course of the trial of this case, took the position that the patent in suit covers any cotton card equipped with crushing rollers if the calender rolls of the card are operating at any surface speed in excess of the surface speed of the crushing rollers. This is to be considered along with the fact that all witnesses for Plaintiff and Defendant agree that the calender rolls in conventional carding machines not equipped with crushing rolls have always been run at a faster surface speed than the doffer. It has always been necessary that this differential of speed exist in order to take up slack in the moving web as it passed from the doffer to the calender rolls. The Plaintiff insists, however, that this differential in speed on a conventional card not equipped with the crush roll apparatus exists only to take up slack in the web and that this difference in speed creates only "tension draft" and does not produce the "relative longitudinal drafting movement of the fibers" contemplated by the patent in suit. Some of the Plaintiff's witnesses testified that they could with the naked eye actually see "relative longitudinal fiber movement" taking place in the moving web between the crush rolls and the calender rolls of the "TRASHMASHER" machine and of the "CROSROL" machine. There were also expressions of opinion by some witnesses who testified for the Plaintiff

that such "relative longitudinal fiber movement" took place in the web, but no witness for the Plaintiff offered any direct objective evidence that "relative longitudinal fiber movement," in fact, takes place in the web on the "TRASH-MASHER." One of the witnesses for the Plaintiff testified that he made certain tests with respect to the cohesiveness of the cotton sliver after it was passed through the Plaintiff's "CROSROL" machine, but it did not appear that he had made any similar tests on the sliver run through the "TRASHMASHER." None of the Plaintiff's witnesses ever made it clear where "tension draft," which is just enough draft to take up slack, ends and where "actual draft" sufficient to produce relative longitudinal fiber movement begins. Upon consideration of all of the evidence and the contentions of counsel during the course of the trial of this case the Court concludes that it is the Plaintiff's position that the patent in suit covers every process and apparatus in which a pair of crushing rollers is placed on a cotton card between the doffer and the calendar rolls if the calender rolls are operated at any surface speed in excess of the surface speed of the crushing rollers. Since the Plaintiff's witnesses concede that it is impossible to operate a cotton card equipped with crushing rollers placed between the doffer and the calender rolls unless the calender rolls are run at some surface speed in excess of the surface speed of the crushing rollers, we conclude that the Plaintiff's position is that its patent grants to the Plaintiff the exclusive right to place crush rollers upon cotton cards.

## THE QUESTION OF VALIDITY OF THE PATENT IN SUIT

### PRIOR PATENTS

"Peralta" crush rolls are old and well known in the woolen industry, they having been used for many years in wool carding machines to crush impurities in wool. The patentee, Andre Varga, admits that insofar as the crush rolls of his patent are concerned they operate upon

precisely the same principal as the "Peralta" rolls. He further admits that wool cards equipped with "Peralta" crush rolls had been used to operate upon 100% cotton webs more than a year prior to the filing date of the patent in the suit, and that this fact was well known to those versed in the art.

A number of prior patents were cited by the Defendants and consideration will now be given to those principally relied upon, none of which were considered by the Patent Office during prosecution of the application which resulted in the issuance of the patent in suit.

The Harmel patent, No. 318,730 issued May 26, 1885 (Tab A of Defendants' Exhibit 3), entitled, "Art of removing foreign substances from wool and other textile fibers," recites (line 9, column 1) that:

"Wool, cotton, and other textile fibers are found to contain always more or less of foreign substances in the nature of burrs, stalks, stems, hulls, &c., the separation of which has always been attended with great difficulty, and the presence of which in the fiber has occasioned much trouble with the delicate machinery employed.

"The object of my invention is to provide an effective method of removing such foreign substances from the fiber. * * *.

"My process is designed most particularly for wool fibers, although it may also be advantageously employed for cotton, and perhaps, also, for other fibers. It is essential that the carded lap be so loose, thin, and open as to expose the burrs and other foreign substances to the action of the rollers, and that the latter be pressed together with sufficient force to thoroughly crush and disintegrate the foreign substances that it is desired to remove."

It thus appears that this patent teaches the passing of a web of fibrous material, including cotton, from a doffer through a pair of crushing rolls in full width for the purpose of crushing foreign matter in the moving web. Further reference to the patent discloses that the top crush rolls are forced into engagement with the botton crush rolls by means of springs or some similar force. After the web is thus treated it is taken in full width from the crush rolls and transmitted to a second doffing cylinder.

The Harmel patent discloses by the diagrammatic figures included in the patent the process of forming the fibers, whether they be wool, cotton or other fibrous material, into a thin carded web, passing the web thus formed through crushing rollers which are adapted to crush small impurities in the web and subjecting the web to a drafting action of undisclosed degree upon leaving the crushing rollers, and also upon leaving the second doffer and passing through the calender rolls. The Harmel patent does not claim to subject the web to sufficient longitudinal drafting action "to cause relative longitudinal fiber movement in the web" as is claimed by the patent in suit, however, figure 2 of the Harmel patent shows that the "squirrel," F', together with the second doffer, D', pulls upon the moving web as the web leaves the crush rolls and the weight of the evidence convinces us that unless the squirrel and the second doffer, either separately or acting together, operate at a surface speed greater than the surface speed of the crush rolls from which the web is taken, the web would not move vertically as is shown by the Harmel patent. A witness for the Defendant testified that there in fact existed relative longitudinal fiber movement, as spoken of in the patent in suit, in the web as shown in Harmel at the point of tangency of the squirrel F' and the second doffer D', and no evidence was offered to the contrary, and the weight of the evidence convinces the Court that such is the case. Claim 1 of the patent in suit is not limited to condensing the fiber into a sliver and since the Plaintiff does not claim that condensing is necessary to attain the advantages of the process set forth in this claim, the Court concludes that every

essential element of claim 1 of the patent in suit is found in the Harmel patent.

It is also noted that the Harmel patent anticipates that the foreign substances in the web which are crushed or broken will fall out in subsequent processing (see Lines 43 to 55 of the Harmel patent).

This patent was not considered by the Patent Office.

The Albero patent, No. 2,075,156 issued March 30, 1937 (Tab C of Defendants' Exhibit 3), entitled, "Apparatus for effecting the removal of foreign bodies from carded webs," teaches the passing of a web of textile fibers through crushing rolls with smooth surfaces, the cylinders being forced to roll against each other under pressure asserted by springs or other mechanical means, the result being that the trashy particles in the web are "trituated" (pulverized), causing the particles to fall out in subsequent processing.

This patent was not considered by the Patent Office.

The Hurst patent, No. 2,509,148 issued May 23, 1950 (Tab K of Defendants' Exhibit 3), entitled, "Conditioning Fibers," also teaches the removal of impurities from textile fibers by employing the use of crush rollers. This patent teaches the drafting of the web of the fiber between two sets of crush rollers which pulverized the undesirable foreign matter. The patent further teaches that after the web leaves the crush rollers it is received and transported by various rolls, screens and cylinders and other elements, all of which are connected in timed relation one to the other for the desired relative speeds "so as to obtain the desired drafting of the fibers." This patent further states that there may be drafting at other stages should the same be desirable and makes extensive reference to the necessity for the maintenance of different speeds of the various rollers and other parts for this general purpose. For the purpose of disclosure the patentee described the apparatus as it would be used in connection with wool fiber, but it was made clear by the inventor that "the in-

vention is adapted for broad application" to other fibers (column 1, line 15). The Hurst patent is a complete anticipation of claim 1 of the patent in suit.

This patent was not considered by the Patent Office.

The Chantler patent, No. 2,326,331 issued August 10, 1943 (Tab B of Defendants' Exhibit 3), is described by the inventor in language which makes it clear that the inventor had in mind dealing with a woolen web, but the evidence as a whole leads the Court to conclude that the web could as well be cotton and the patent clearly shows the same elements and arrangement and speed differentials as are suggested by the patent in suit. This patent shows a doffer from which the moving web of fibrous material is delivered, a pair of crush rolls which receive the web and crush the impurities, a trumpet into which the web is fed, and finally, a pair of calender rolls with means to drive the calender rolls. While the Chantler patent does not specifically speak of running the calender rolls faster than the crushing rolls the Court concludes from the evidence as a whole that such difference in speed of the calender rolls over the crush rolls at the time of the issuance of the Chantler patent was a well known expedient in the textile art. Therefore, the Court finds as a fact that since all of the means required to run the calender rolls of the Chantler apparatus at a speed faster than the crushing rolls are clearly shown by the patent, the Chantler patent is a complete anticipation of all of the claims of the patent in suit, claims 1, 2 and 3. The Court further finds as a fact that the Chantler apparatus when operated according to the practice which was prevalent in the industry on the date of the issuance of the patent did inherently result in carrying out the process set forth in claim 1 of the patent in suit.

This patent was not considered by the Patent Office.

The Varga patent, No. 2,762,295 issued September 11, 1956, the Spence British patent No. 3,713, issued March 11, 1887, and the Clark British patent No. 650,029

issued February 14, 1951, all show crushing rolls operating upon moving fiber webs with the intent of removing impurities from the web by crushing.

As previously noted, none of the above patents were considered by the Patent Office during the prosecution of the application resulting in the patent in suit, and the Court finds that these patents are more pertinent to the claims in suit than any of the other references considered by the Patent Office during the pendency of the application resulting in the patent in suit.

In the prior patents referred to it is clear that the object of crushing is to disintegrate and pulverize the trash that may be in the web as it comes from the doffer, and since the prior art teaches the crushing of such trash in such moving webs, the evidence as a whole points to the fact that such crushed trash falls out during subsequent processes, such as, spinning, drawing, weaving and the like. The Court finds as a fact that the use of crushing rolls upon a carded cotton web as the web moves between the doffer and the calender rolls is simply the extension of the use of these same instrumentalities operating in the same way to produce the same results as used in the prior art relating to the crushing of impurities in moving woolen webs. The Court further finds as a fact that since cards have been known it has been customary and necessary to run the calender rolls of the carding machine at a surface speed in excess of the surface speed of the doffer and that any cotton card equipped with crush rolls must have its calender rolls operate at such excess speed if it is to be operative in commercial practice. In fact, this is admitted by all of the witnesses in this case.

## PRIOR PUBLICATIONS

Certain publications of the Plaintiff which were issued prior to the date of application for the patent in suit clearly set forth the concept of using crush rolls "for the more efficient elimination (crushing) of impurities (such as, burrs, seeds, shives, hard threads, skin, tar, etc.) in wool, wool waste, shoddy, cotton waste, cotton, etc." One of these publications is dated January, 1957 and the other is dated March, 1957, the first publication appearing by way of reproduction as Tab B in Defendants' Exhibit 4, and the other appearing as Tab E in Defendants' Exhibit 4. Each of these publications clearly teaches that the desired effect is "achieved by the smooth precision ground rolls resulting in a marked improvement in drafting and spinning, permitting substantial increase in overall production." Also, each of these publications speaks of crush rolls "with adjustable helical line of contact." The Court interprets this last expression as meaning that the publications are referring to Varga patent No. 2,762,295, (Tab L of Defendants' Exhibit 3) inasmuch as that patent teaches and claims the setting of the rolls with their longitudinal axes out of alignment, thereby obtaining "helical line of contact."

Since both of the publications above mentioned have an effective date more than one year prior to the filing date of the patent in suit in the United States, both of these publications are part of the body of prior art because while it is true that the above mentioned publications disclose the use of crushing rolls primarily on wool cards, nevertheless the Court finds as a fact that these publications teach the essence of the claims of the patent in suit, namely, that of using crush rolls to crush trash in moving cotton webs. It has already been observed that the Plaintiff's concept of the patent in suit is that it is broad enough to cover the mere placing of crush rolls on a cotton card and the Court finds as a fact that the inventive concept of so doing is clearly disclosed in the aforesaid printed publications of the Plaintiff. The concept of passing cotton webs through crush rolls is also set forth by another publication of the Plaintiff company dated October, 1957. This appears by way of reproduction as Defendants' Exhibit 4, Tab C.

In November, 1948 an article written by a Mr. G. Marshall, who during the trial of this case was identified as an

official of Plaintiff's related British company, stated that "Peraltas (crush rolls) are running successfully on blends containing 100% cotton." This statement appears at page 522 of the reproduction of this article which is identified in the record as Tab F of Defendants' Exhibit 4.

A review of other prior publications relied upon by the Defendant which are found in Defendant's Exhibit 4 and have to do with the operation of conventional cards shows that they clearly teach that the calender rolls of such conventional cards have been operated at speeds of as much as 29% in excess of the surface speed of the doffer of the carding machine, which further accentuates the finding already made that it was well known in the art to operate calender rolls at such greater speeds prior to the issuance of the patent in suit.

Another part of the body of the prior art is found in a publication printed in June, 1956 which appears as Tab O of Defendants' Exhibit 4. Figure 20 on page 295 of "The Textile Manufacturer" for the month of June, 1956, shows a textile carding system in which following the doffer "D" there is a set of rollers labelled "Calender rollers or crushers." Following this at "A" in this figure there is indicated a coiler can to receive the sliver. From all of the evidence in this case, including the testimony of Andre Varga himself, the Court concludes that if the rolls "B" as shown in this figure are in fact crushers, as the drawing indicates they may be, then it necessarily follows that between the crushers and the head of the coiler can there must be a set of calender rolls. Mr. Varga, in explaining why claim 1 of his patent did not include the step of condensing the web into a sliver, stated that to everyone skilled in this art the fact that one shows in these machines a set of calender rolls necessarily implies that one intends to include a trumpet. This means to the Court and the Court finds as a matter of fact that whenever one shows a coiler, which is a can in which the ropelike sliver is placed, such showing inherently means

to persons of ordinary skill in this art that ahead of the coiler there is a pair of calender rolls and some means to condense the web into a sliver, this being what is called a trumpet.

### "ROL-A-SLIVUP" MACHINE

Reference has already been made to the "ROL-A-SLIVUP" machine and the fact that it was stipulated by the Plaintiff during the trial of this case that this machine is in fact prior art. The "ROL-A-SLIVUP" machine was introduced into evidence as Defendants' Exhibit 6 and photographs and a sketch of the machine appear in the record as Defendants' Exhibits 17 through 21. The "ROL-A-SLIVUP" embodies a set of "peeler" rolls through which the moving cotton web which is taken from the doffer passes on its way to the trumpet and thence to the calender rolls. The calender roll surface speed of the "ROL-A-SLIVUP" is 12.5% in excess of that of the peeler rolls. The top peeler roll of the "ROL-A-SLIVUP" is pressed down onto the lower roll by means of set screws at each end of the shaft of the top roll. The peeler rolls operate on the full width of the web coming from the doffer.

The "peeler rolls" of the "ROL-A-SLIVUP" grip the moving cotton web as the web passes between the rollers. These peeler rolls grip the web in the same fashion as the web is gripped by the crush rollers referred to by the patent in suit and in the same manner as the crush rolls employed in the "TRASHMASH-ER." This being true, and this being coupled with the fact that the calender rolls operate faster than the surface speed of the peeler rolls, means that the identical kind of "drafting" takes place between the peeler rolls and calender rolls of the "ROL-A-SLIVUP" as that disclosed and claimed in the patent in suit. Mr. Blomquist, a witness for the Defendants, testified that he made measurements of the speed of the parts of the "ROL-A-SLIVUP" and further that he examined samples of the trash which had been accumulated on the machine as the web passed through the peeler rolls. He testi-

fied that the peeler rolls did in fact grip the web and that there was some crushing of the impurities in the web by such rollers. It was the Plaintiff's position that these peeler rolls in the "ROL-A-SLIVUP" did no crushing of the web, but the weight of the testimony convinces the Court that because the top roll is pressed against the lower roll some crushing is necessarily performed, although admittedly this machine would not be used primarily for crushing purposes. All of the essentials being present in this machine as described by the patent in suit, the Court concludes that the "ROL-A-SLIVUP" meets every essential limitation of the process set forth in claim 1 of the patent in suit and in like manner meets every essential recitation of apparatus structure as set forth in claims 2 and 3. In arriving at this conclusion the Court is not unmindful of the fact that claim 2 makes reference to rotating the crushing rollers at a speed sufficient to take up slack in the web as the web comes off of the doffer and passes to the crushing rollers. In that connection we find as a matter of fact that since the peeler rollers in the "ROL-A-SLIVUP" actually pull the web from the doffer it is obvious that these peeler rollers are rotated at a speed adequate to take up whatever slack might be present between them and the doffer.

In reviewing what has been said concerning prior art the Court is not unmindful of the fact that there is an absence of specifics in much of this prior art material concerning the size and weight of rollers, the speed at which the various parts are to be operated, and the amount of pressure which is applied or must be applied to the crush rollers where they are shown, but, as has already been pointed out, the patent in suit is also indefinite in these particulars in that it nowhere sets forth such specifics, and since the patent in suit is indefinite in these particulars the prior art referred to which is regarded as anticipating the patented process and apparatus cannot be assailed on the ground that it, too, is likewise indefinite in these particulars.

THE QUESTION OF OBVIOUSNESS

The Defendants contend that the process set forth in claim 1 of the patent in suit and the apparatus set forth in claims 2 and 3 thereof would have been obvious to a person having ordinary skill in the art at the time the invention of the patent in suit was made, and the Court finds this contention of the Defendants to have been sustained by virtue of the following facts clearly established by the evidence considered as a whole:

(1) The various prior patents and prior publications heretofore discussed clearly show that crush rolls for operating upon moving webs for the removal of impurities were old and well known at the time of this invention.

(2) The operation of calender rolls of carding machines not equipped with crush rolls at a surface speed in excess of the surface speed of the doffer has been a practice uniformly followed in the textile industry and nothing new is involved in such an arrangement.

(3) Because the calender rolls of the "ROL-A-SLIVUP" machine run faster than the surface speed of the peeler rolls, the "ROL-A-SLIVUP" machine, therefore, performs the same kind of "drafting" and achieves the same "relative longitudinal fiber movement" which is claimed by the patent in suit. In this connection the Court finds as a fact that if it were desired for a "ROL-A-SLIVUP" to crush more impurities than it does it would have been obvious to a person having ordinary skill in this art that all that was needed was for the peeler rolls to be enlarged in order that more pressure might be applied or even that without enlarging the size of the peeler rolls the pressure might be increased, as suggested by the Caspari patent (No. 2,854,700 filed March 30, 1953, issued October 7, 1958). This patent appears as Tab N of Defendants' Exhibit 3. The Caspari patent discloses means for pressing small diameter crush rollers together and teaches that such rolls may be rather slender or small in diameter, it being remembered that the patent in suit

does not specify that the crush rolls must be of any specific diameter, or be pressed together with any specific amount of force or in any particular way.

Stated otherwise, the Court specifically finds that there is no difference between the subject matter of the claims in suit and the disclosures of the prior art in this field including the patents, publications, and the "ROL-A-SLIVUP" that would not have been obvious to a person having ordinary skill in the art at the time of the invention of the patent in suit. The use of crush rolls on a fiber web was not a new idea and to put such rolls on a cotton card and run the calender rolls of that card at the speed at which calender rolls have always been run is not a patentable invention.

## THE QUESTION OF UTILITY OF THE PATENTED PROCESS AND APPARATUS

One of the defenses asserted by the Defendants is that the patent does not claim any invention having any utility within the meaning of the patent laws. In this connection we are reminded that the patent covers a combination of crushing plus "drafting" and the patentee claimed that it was the combination which produces the removal of impurities from the web. We find as a matter of fact that the evidence considered as a whole demonstrates that it is not the combination of crushing and drafting which produces the desired result, but that it is the crushing alone which gives the beneficial improvement. The Defendants introduced objective evidence of tests conducted by their expert witness, Mr. Blomquist, which the Court finds convincing in this regard. These tests consisted of running the calender rolls of a "TRASHMASHER" at surface speeds 2%, 16% and 35% faster than the surface speeds of the crush rolls, then making the sliver which was formed from the web into yarn, and finally making the yarn into cloth. It is, of course, obvious that the "drafting action" would increase as the differential between the speed of the calender rolls and the surface speed of the crushing rolls became greater, and

that the drafting action would decrease as the surface speed differential became less. The Defendants introduced samples of the amount of trash collected beneath the web, samples of the sliver which was formed from the web, samples of the yarn which was formed from the sliver, and samples of cloth material which was formed from the yarn, all demonstrating the results at the different speed differentials. These items appear as Defendants' Exhibits 22 through 36 in the record. The Court made a cursory examination of these samples at the time they were introduced and has since made a more careful examination of them, microscopic and otherwise, and this evidence, together with the testimony of Mr. Blomquist and the record as a whole, convinces the Court that the improvement in the yarn and in the cloth is attributable solely to the crushing action of the crush rolls and that the so-called "drafting" between the crush rolls and calender rolls, even if it occurs, adds nothing of any consequence to this improvement. The Plaintiffs never satisfactorily demonstrated to the Court that it was the combination of the crushing plus the so-called "drafting" which resulted in the beneficial improvement in the yarn and cloth, and the evidence introduced by the Defendants convinces the Court to the contrary. The Court concludes, therefore, that the claims set forth no invention having any utility inasmuch as the claims cover the combination of crushing plus "drafting," when in fact the crushing alone is the step which gives the beneficial improvement of trash removal.

## THE QUESTION OF INFRINGEMENT

It would appear to be academic that an invalid patent cannot be infringed, however, we have the question of infringement presented by the pleadings and the evidence and we will deal with it. In support of their contention that the accused machine does not infringe the patent of the Plaintiffs, even if the patent be valid, the Defendants had prepared and submitted in evidence a series of motion pictures made of the

operation of the accused apparatus. These were exhibited to the Court and they are in the record as Defendants' Exhibit 39. These motion pictures were made at regular camera speeds and in slow motion, some of the latter of which were at about 2,000 frames per second, showing the moving web of the "TRASHMASHER." Other motion pictures similarly produced showed the moving web of the Plaintiff's machine, the "CROSROL." In viewing these pictures the Court observed and concluded that it was impossible to detect any relative longitudinal fiber movement "as occurs in drafting," that is, any slippage of the fibers relative to one another in the direction of the movement of the web as a whole. On the contrary, from these pictures the Court could and did discern by observing certain irregularities or spots or neps in the web that such movement did not take place. This conclusion of the Court agrees with the testimony of the Defendants' expert witness, Mr. Blomquist, who testified that such movement was absent. The patentee, Mr. Varga, illustrated what he meant in his patent by "longitudinal fiber movement" by interlacing the fingers of his hands and drawing his hands apart with his fingers outstretched, stating that this is precisely the movement which occurs in actual drafting, that is, that the fibers in the web as a whole physically slip relative to each other in the direction of movement of the web, producing what is sometimes called "parallelization." The Court could not observe such movement of the fibers and at no time during the course of the trial of this case did the Plaintiff's witnesses make any attempt to point out to the Court where such movement was taking place in the moving web. The only evidence offered by the Plaintiffs to support their contention that the accused machine infringes the claimed process was in the nature of opinion evidence and none of these witnesses who expressed opinions that such movement did take place in the web of the "TRASHMASHER" had ever made any direct tests, close inspections or ob-servations of the web between the crush rolls and calender rolls of the accused machine to determine whether there was any "relative longitudinal fiber movement" as "occurs in drafting."

Considering the teaching of the patent in suit to the effect that the kind of drafting required to get the improved results of the process and apparatus claimed is the kind "as occurs in drafting," the Court finds as a fact that this kind of drafting does not occur in the accused process or apparatus. The only kind of pull (draft) which the Defendants apply to the web in the accused process and apparatus is the same pull which is present in conventional cards which operate without crush rollers, that being the pull necessary to take up any slack in the web, this being known as "tension" draft as distinguished from "actual" draft, and the Plaintiff concedes that tension draft is not the kind of drafting action contemplated by the patent. But regardless of whether or not the kind of draft spoken of in the patent in suit occurs or does not occur, the Court further finds that the accused process and apparatus does not infringe any valid claim of the patent in suit because what the patentees are doing has been carried out in the prior art as heretofore referred to in this memorandum and that whatever is taking place in the web in the accused process and machine takes place in the actual operation of the "ROL-A-SLIVUP" and within the contemplation of the disclosures of the Harmel patent and the Chantler patent heretofore discussed.

With respect to the apparatus claims 2 and 3 the patent in suit teaches that the crush rollers rotate at a speed sufficient to take up slack between them and the doffer, namely, at a speed sufficiently higher than the speed of the doffer to do this. Further, it is noted that in the commercial "CROSROL" machine the crush rolls rotate at a greater surface speed than the surface speed of the doffer. The undisputed testimony in the case is that the crushing rollers of the accused machine, the "TRASHMASH-

456

ER," rotate at a surface speed less than the surface speed of the doffer, and while it is true that in the "TRASHMASH-ER" the web does not build up between the doffer and the crush rollers, this fact alone is not sufficient to convince the Court that the above quoted element from claims 2 and 3 is present in the accused "TRASHMASHER" for, as the testimony in the case demonstrated, there may be other explanations of this physical result. The Court finds as a fact that the only means disclosed in the patent to take up slack at this point in the process is the driving of the crush rolls at a greater surface speed than the surface speed of the doffer and the uncontradicted evidence in the case demonstrates that the Defendants do not do and have never done this.

These factual conclusions reached by the Court do not necessarily mean that Mr. Varga, the patentee, has not made any contribution to the art which we have had under consideration, for such contribution may be embodied in claims 4 and 5 of the patent as represented by figure 3 of the patent. In those claims it is contemplated that crush rolls may be used in tandem and spaced just beyond the staple length of the fiber and it is admitted that if this were done one could indeed obtain "relative longitudinal fiber movement" as "occurs in drafting," but the Defendants have never done this and are not charged with infringement of that modification, these claims not being here in suit.

## FINDINGS OF FACT

The Court's findings of fact are included in the foregoing memorandum. If any of the findings included in the memorandum are construed to constitute conclusions of law as distinguished from conclusions of fact, such findings are adopted as conclusions of law to the same extent as if they had been so denominated.

## CONCLUSIONS OF LAW

There is no issue of jurisdiction. The Court has jurisdiction of the parties and the subject matter in the cause of action.

35 U.S.C. § 282 is clear in establishing, for every patent, a prima facie presumption of validity. However, this presumption is rebuttable and the courts have never hesitated to disregard this presumption when the facts warrant it. Fairchild v. Poe, etc., (5 Cir. 1958), 259 F.2d 329. The presumption has been clearly rebutted in this case. The presumption of validity of the patent in suit is greatly weakened if not completely destroyed by the failure of the Patent Office to consider the important and analogous contributions to the prior art which have been discussed in the foregoing memorandum. Cornell et al. v. Adams Engineering Co., Inc. (5 Cir. 1958), 258 F.2d 874; Murray Company of Texas, Inc. v. Continental Gin Company (5 Cir. 1959), 264 F.2d 65.

The patent in suit, U. S. Letters Patent No. 3,003,195, is invalid and void in law as to claims 1, 2 and 3 here in suit for each of the following reasons:

1. Each of the claims in suit is directed to subject matter that is fully anticipated by the prior art, notably by U. S. Patent No. 318,730 issued to Harmel, by U. S. Patent No. 2,326,331 issued to Chantler, and by the "ROL-A-SLIVUP" machine. Additionally, claim 1 is also anticipated by U. S. Patent 2,-509,148 issued to Hurst. Further, the prior publications identified in the record as Tabs B, C, E and O of Defendants' Exhibit 4, when considered individually or in combination with each other, render the claims invalid.

2. The patent in suit does not meet the requirement of invention. The use of crush rolls on cotton cards is a mere extension of their prior and completely analogous use in operating upon other types of fibers and it is not invention to use an old process or an old machine for a new and analogous purpose. The Fluor Corporation, Ltd. v. Gulf Interstate Gas Co. (5 Cir. 1958), 259 F.2d 405. The claims in suit and each of them are directed to subject matter that distin-

guishes over the prior art, if at all, only in degree rather than in kind and in ways that would have been obvious to those having ordinary skill in the relevant art at the time the patentee made the alleged invention.

The patent in suit being found to be invalid cannot be found to be infringed, but if the patent in suit should be valid it has not been infringed by the Defendants because the claims of the patent in suit cannot be construed to cover the accused process and apparatus.

Plaintiff has failed to show infringement because the Plaintiff has failed to prove that there takes place in the accused process and apparatus the kind of "relative longitudinal fiber movement" claimed in the patent in suit.

The claims in suit and each of them are invalid because of the manufacture, sale and public use in the United States of a method and apparatus for the treatment of cotton fibers purportedly covered by the claims of the patent in suit more than one year prior to the filing of the application on which said patent in suit was obtained.

Defendants have the legal right to manufacture and sell the "TRASH-MASHER" machine and to practice the process typified by said machine (Plaintiff's Exhibit 7) and their doing so does not constitute infringement of claims 1, 2 and 3 of United States Letters Patent 3,003,195, the patent in suit.

The Plaintiff has not maintained its burden of proof with respect to the issues concerning which it had the burden. The Defendants have sustained their burden of proof with respect to the issues concerning which they had the burden.

Accordingly, the complaint will be dismissed, the Defendants will be awarded their taxable costs and judgment will be entered for the Defendants declaring that said Letters Patent No. 3,003,195 as to the claims here in suit, they being claims 1, 2 and 3, are invalid and unenforceable against Defendants. The Plaintiffs and those acting in concert with Plaintiff will be enjoined from maintaining or bringing any other suit, claims or causes of action against Defendants, their licensees, customers and assigns under claims 1, 2 and 3 of the patent in suit and from threatening to do so.